**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UMID HAFIZI individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>CENTERFIELD MEDIA PARENT, INC., and CENTERFIELD MEDIA HOLDINGS, LLC d/b/a AUTOQUOTEGUIDE<br><br>Defendant. | Civil Action No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Umid Hafizi ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendants Centerfield Media Parent, Inc., and Centerfield Media Holdings, LLC d/b/a AutoQuoteGuide (collectively, "Defendants," "AutoQuoteGuide," or "AQG"). Plaintiff makes the following allegations based upon personal knowledge as to Plaintiff and Plaintiff's own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's counsel.

## NATURE OF THE ACTION

1. Plaintiff brings this putative class action pursuant against Defendants to secure redress for their violations of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. §§ 227, *et seq*.

2. Defendants own, operate, and/or work in concert with a car insurance referral service called AutoQuoteGuide. Through their website, https://www.autoquoteguide.com/ (the "Website"), Defendants aggregate car insurance offers and "match and directly connect consumers with insurance companies and agents across the US."[1]

[1] https://www.autoquoteguide.com/ (last accessed Nov. 24, 2025) ("Auto Quote Guide is an online insurance referral site. … We match and directly connect consumers with insurance

3. To promote their services, Defendants engage in aggressive text messaging marketing campaigns to consumers with no regard for their rights under the TCPA, and they continue to send text messages to consumers even after they opt out from Defendants' messages.

4. As alleged herein, Defendants have engaged in a pattern of unlawful telemarketing by targeting Plaintiff and the proposed Class (the "Class," defined below) with unsolicited telephone solicitations, causing widespread annoyance and harm, in violation of the TCPA, including by, *inter alia*: (a) using an automatic telephone dialing system ("ATDS") for the selection and dialing of telephone numbers in violation of 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. § 64.1200(a); and (b) failing to maintain the "minimum standards" for statutorily required "procedures for maintaining a list of persons who request not to receive" marketing text messages, in violation of 47 C.F.R. § 64.1200(d).

5. Through this action, Plaintiff seeks injunctive relief to halt Defendants' unlawful conduct, which has resulted in the intrusion upon seclusion, invasion of privacy, harassment, aggravation, and disruption of the daily life of Plaintiff and the Class members.

6. Plaintiff also seeks statutory and treble damages on behalf of himself and the members of the Class, and any other available legal or equitable remedies.

## PARTIES

7. Plaintiff Umid Hafizi is a natural person and citizen of New York, residing in Flushing, New York. Plaintiff is, and at all times relevant hereto was, an individual and the sole

---

companies and agents across the US. … We do not provide insurance and we do not represent any specific insurance provider or automobile company. … Auto Quote Guide provides access to independent auto insurance services and acts as an affiliate to these services."); *see also* AQG Website, *SMS Terms* (last updated Sep. 27, 2024), https://www.autoquoteguide.com/sms-terms (last accessed Nov. 24, 2025) ("AutoQuoteGuide.com consists of a network of insurance carriers and advertisers who are interested in, and can potentially provide, insurance assistance to a consumer, generally in the form of a policy or similar products. … [AQG] may send text messages to consumers interested in insurance products. …").

subscriber of the residential telephone number ending in 7342 (the "7342 Number") that received Defendants' text message solicitations.

8. Defendant Centerfield Media Parent, Inc. ("Centerfield Parent") is a Delaware corporation with its principal place of business at 12130 Millennium Drive, Suite 600, Los Angeles, California.

9. Defendant Centerfield Media Holdings, LLC, d/b/a AutoQuoteGuide ("Centerfield Holdings") (together with Defendant Centerfield Parent, "Defendants," "Centerfield," "AutoQuoteGuide," or "AQG") is a Delaware limited liability company with its principal place of business at 12130 Millennium Drive, Suite 600, Los Angeles, California.

10. Centerfield is a technology service for digital customer acquisition. Specifically, through its proprietary marketing platform, Centerfield provides in-market qualified consumers to leading auto, home, life, health, Medicare, and commercial insurance companies and agents at scale. As part of these services, "Centerfield handles over 25 million phone calls, chats, emails, and SMS for Fortune 100 companies in B2B, home services, e-commerce, and insurance."[2] Relevant here, Centerfield provides such services through its large portfolio of digital, which include, *inter alia*, AutoQuoteGuide.com ("AutoQuoteGuide," "AQG," or the "Website"). AQG is an online insurance referral website that "match[es] and directly connect[s] consumers with insurance companies and agents across the US" and "provides access to independent auto insurance services and acts as an affiliate to these services."[3] On information and belief, Centerfield owns and/or operates the AQG brand and Website.

11. Through AQG, Centerfield has done business in and throughout New York and the United States at all times during the Class Period. At all relevant times, acting alone or in

---

[2] https://www.centerfield.com/services/.

[3] https://www.autoquoteguide.com/.

concert with others, Centerfield provided its automobile insurance lead generator and marketing services, and all products and services pertaining thereto, to consumers in New York and throughout the United States. Further, at all relevant times, acting alone or in concert with others, Centerfield called, chatted, emailed, and—relevant to Plaintiff's complaint—**texted** consumers under the AQG brand name on behalf of third-party affiliates (*i.e.*, independent insurance companies). At all relevant times, acting alone or in concert with others, Centerfield formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices set forth in this Complaint.

12. On information and belief, Defendants jointly control, own, and/or operate the brand name "AutoQuoteGuide" and corresponding Website, https://www.autoquoteguide.com/, which is an automobile insurance lead generator service.

13. Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, and/or conspired in the unlawful conduct alleged herein.

## JURISDICTION AND VENUE

14. This Court has federal question subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the action arises under the TCPA.

15. This Court has personal jurisdiction over Defendants, and venue is proper in this District, because Defendants direct, market, and provide its business activities to consumers in this District, and because Defendants' authorized text messaging / marketing scheme was directed by Defendants to consumers (including Plaintiff) in this District. Specifically, Defendants directed unsolicited text messages to Plaintiff in this District, where he resides. *See Luna v. Shac, LLC*, 2014 WL 3421514, at *4 (N.D. Cal. July 14, 2014) ("When [Defendant]

intentionally sent unsolicited text messages advertising Sapphire to California cell phone numbers, which conduct gave rise to this litigation, it purposefully directed its activity to California such that [Defendant] is reasonably subject to the personal jurisdiction of this Court."); *see also Barton v. Real Innovation Inc.*, 792 F. Supp. 3d 1195, 1204 (W.D. Wash. 2025) ("Plaintiff alleges that the Defendants are subject to jurisdiction in this Court because they directed phone calls to Plaintiff in Washington, where he resides. Numerous courts have held that a telemarketer who makes phone calls into the forum state is subject to specific personal jurisdiction there as to TCPA claims arising from those calls, at least when the phone number is registered in the forum state. … The Court finds that this is sufficient to establish personal jurisdiction at the pleading stage ….") (citations omitted); *accord Ott v. Mortg. Invs. Corp. of Ohio*, 65 F. Supp. 3d 1046, 1057-1059 (D. Or. 2014). Plaintiff also unsuccessfully requested to be removed from Defendants messaging list from this District. Additionally, Plaintiff's telephone number has an area code (646) that specifically coincides with locations in this District. *See Barton*, 792 F. Supp. 3d at 1204 ("An area code in the forum state can serve as an indicator to a defendant that they are transacting business in the forum ….").

## **FACTUAL ALLEGATIONS**

### **A. Background On The TCPA**

11. Plaintiff brings this case to protect his privacy rights; namely, the right to be left alone from unwanted telemarking communications.

12. Plaintiff brings this suit in an effort to stop companies, like Defendants, from sending text messages to his and putative class members' phones after they had expressly required that Defendants cease from doing so.

13. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the Telephone Consumer Protection Act ("TCPA") into law, to protect

consumers' privacy rights; namely, the right to be left alone from unwanted telemarketing communications. A leading sponsor of the TCPA described unwanted telemarketing communications as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991); *see also Facebook, Inc. v. Duguid*, 592 U.S. 395, 399 (2021) ("In 1991, Congress passed the TCPA to address 'the proliferation of intrusive, nuisance calls' to consumers and businesses from telemarketers.") (citation omitted); *id.* at 408 (noting TCPA's aim to curb "intrusive telemarketing practices").

14. More specifically, through its enactment of the TCPA, Congress sought to protect consumers from intrusive and unwanted robocalls and text messages that invade privacy and disrupt daily life. *See, e.g.*, *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017) ("The TCPA establishes the substantive right to be free from certain types of phone calls and texts absent consumer consent. Congress identified unsolicited contact as a concrete harm, and gave consumers a means to redress this harm. … Congress aimed to curb telemarketing calls to which consumers did not consent by prohibiting such conduct and creating a statutory scheme giving damages if that prohibition was violated."); *Hall v. Smosh Dot Com, Inc.*, 72 F.4th 983, 986 (9th Cir. 2023) ("Congress granted residential phone subscribers the right to create a private line, free from unsolicited calls and intrusive texts."); *accord*; *Wakefield v. ViSalus, Inc.*, 51 F.4th 1109, 1117–18 (9th Cir. 2022); *Chennette v. Porch.com, Inc.*, 50 F.4th 1217, 1222 (9th Cir. 2022); *see also Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016).

15. The TCPA proscribes abusive telemarketing practices by, *inter alia*, "prohibit[ing] live solicitation calls to wireless numbers using an autodialer." *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14143 n.611 (2003) (citing 47 U.S.C. § 227(b)(1)). Specifically, the TCPA provides that, with few exceptions, calls and texts sent to consumers using an autodialier are unlawful unless the sender

first obtained the "prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii) ("It shall be unlawful for any person within the United States … (A) to make any call (other than a call … made with the prior express consent of the called party) using any automatic telephone dialing system … (iii) to any telephone number assigned to a … cellular telephone service …."); *accord* 47 C.F.R. § 64.1200(a)(1)(iii) ("No person or entity may: (1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call … made with the prior express consent of the called party) using an automatic telephone dialing system … (iii) To any telephone number assigned to a … cellular telephone service …."). The term "autodialer," also referred to as an "automatic telephone dialing system" ("ATDS"), is defined by statute to mean "equipment which has the capacity to store or produce telephone numbers to be called using a random or sequential number generator and to dial such numbers." 47 C.F.R. § 64.1200(f)(2) ("The terms automatic telephone dialing system and autodialer mean …."); *accord* 47 U.S.C. § 227(a)(1). Thus, where an entity sends a text message to a consumer's cell phone using an autodialer without having first obtained the consumer's "prior express consent" for the call or text, the TCPA is violated pursuant to 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. § 64.1200(a)(1)(iii), regardless of the content of the text message.

16. Furthermore, for a text sent using an autodialer that "includes or introduces an advertisement or constitutes telemarketing," the TCPA requires that the sender must have first obtained the consumer's "prior express *written* consent." 47 C.F.R. § 64.1200(a)(2) ("No person or entity may: … (2) Initiate, or cause to be initiated, any telephone call that includes or

introduces an advertisement[4] or constitutes telemarketing[5], using an automatic telephone dialing system …, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent[6] of the called party ….") (emphasis added). Otherwise, an entity that sends such a text without "prior express written consent" also violates 47 C.F.R. § 64.1200(a)(2).

17. In addition, and particularly relevant here, the TCPA also affords special protection for people who request to be placed on a company's internal do not call list, as detailed below. *See* 47 C.F.R. § 64.1200(d). Moreover, the TCPA provides that each person who receives more than one call on their cell phone after requesting to be placed on the company's internal do not call list is entitled to recover a penalty of $500 per call. *See* 47 U.S.C. § 227(c)(5) ("A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may … bring … (A) an action based on a violation of the regulations prescribed

---

[4] "The term *advertisement* means any material advertising the commercial availability or quality of any property, goods, or services." 47 C.F.R. § 64.1200(f)(1).

[5] "The term *telemarketing* means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. § 64.1200(f)(13).

[6] "The term prior express written consent means an agreement, in writing, bearing the signature of the person called that clearly authorizes the seller to deliver or cause to be delivered to the person called advertisements or telemarketing messages using an automatic telephone dialing system or an artificial or prerecorded voice, and the telephone number to which the signatory authorizes such advertisements or telemarketing messages to be delivered." 47 C.F.R. § 64.1200(f)(9). Further, "[t]he written agreement shall include a clear and conspicuous disclosure informing the person signing that: (A) By executing the agreement, such person authorizes the seller to deliver or cause to be delivered to the signatory telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice; and (B) The person is not required to sign the agreement (directly or indirectly), or agree to enter into such an agreement as a condition of purchasing any property, goods, or services." *Id.* § 64.1200(f)(9)(i) (emphasis added); *see also id.* § 64.1200(f)(3) ("The term *clear and conspicuous* means a notice that would be apparent to the reasonable consumer, separate and distinguishable from the advertising copy or other disclosures.").

under this subsection to enjoin such violation, (B) an action … to receive up to $500 in damages for each such violation, whichever is greater, or (C) both such actions.”).

18. Under the TCPA’s implementing regulations, FCC guidance, and well-settled case law, text messages constitute “calls” within the meaning of the TCPA. *See* 47 C.F.R. § 64.1200(e) (“The rules set forth in paragraph … (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing … text messages to wireless telephone numbers ….”); *id.* § 64.1200(a)(9) (“[T]he term ‘call’ includes a text message, including a short message service (SMS) call.”); *see also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1041–42 (9th Cir. 2017) (“[T]he Federal Communications Commission (FCC), the agency implementing the TCPA, has interpreted the TCPA to ‘encompass[ ] both voice calls and text calls to wireless numbers including, for example, short message service (SMS) calls,’ which are generally referred to as text messages.”) (citing *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C. Rcd. 14014, 14115 (July 3, 2003)); *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) (“A text message to a cellular telephone, it is undisputed, qualifies as a ‘call’ within the compass of [the TCPA].”) (citation omitted); *accord Gomez v. Campbell-Ewald Co.*, 768 F.3d 871, 874 (9th Cir. 2014); *Satterfield v. Simon & Schuster, Inc.*, 569. F.3d 946, 954 (9th Cir. 2009) (holding that the FCC’s interpretation that a text message is a “call” under the TCPA is reasonable). Thus, text messages are calls and are subject to the TCPA.

19. The problem with receiving unwanted telemarketing communications is one that most people in this country, like Plaintiff, frequently face. A 2023 tally found that Americans received 415,172,654 spam texts per day that year.[7] Further, New Yorkers received 534,341,450

[7] *See* Text-Em-All, *2023 Spam Text Statistics: Are Spam Texts On The Rise?* (Oct. 19, 2023) (“*2023 Spam Text Statistics*”), https://www.text-em-all.com/blog/spam-text-statistics.

spam texts during the month of September 2023 alone, making it among the states most targeted by text spammers during that period.[8] Text spammers targeted California more than any other state in September 2023, sending approximately 1,315,688,592 spam texts to Californians during the same time frame.[9] While these 2023 figures are already astronomical, there was a significant increase in overall scam and telemarketing messages sent and received in 2025 as compared to prior years. Indeed, while Americans received a total of approximately 12.4 billion spam texts in September 2023, they received approximately "***19.2 billion spam texts*** in September 2025," which is "nearly ***63 spam texts*** for every person in the U.S."[10]

20. These text messages are not only intrusive and harmful to consumers' privacy interests, but they are expensive. Indeed, scam texts cost Americans over $326 million in 2022[11], and those costs have necessarily risen over the last few years, as the number and frequency of spam text messages sent to and received by consumers has increased.

21. To combat this issue, in addition prohibiting use of an ATDS to send text messages without the requisite prior consent (*see supra*), under 47 C.F.R. § 64.1200(d) the TCPA also requires that a company implement certain minimum policies and procedures prior to making telemarketing calls, which include texts. These policies and procedures include, in relevant part, maintaining of a written policy, available upon demand, for maintaining a do-not-call list; training personnel engaged in telemarketing; and recording and honoring do-not-call requests when made, as follows:

> (d) No person or entity shall initiate … any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not

---

[8] *See id.*

[9] *See id.*

[10] Robokiller, *How many robotexts are Americans getting?*, https://www.robokiller.com/spam-text-insights (last accessed Oct. 14, 2025) (emphasis in original).

[11] *See* Text-Em-All, *2023 Spam Text Statistics*, *supra*.

> to receive such calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> > (1) ***Written policy.*** Persons or entities making … calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
> >
> > (2) ***Training of personnel.*** Personnel … who are engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.
> >
> > (3) ***Recording, disclosure of do-not-call requests.*** If a person or entity making … any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. …
> >
> > (4) ***Identification of callers and telemarketers.*** A person or entity making … any call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. …
> >
> > (6) ***Maintenance of do-not-call lists.*** A person or entity making … any call for telemarketing purposes must maintain a record of a consumer's request not to receive further calls. A do-not-call request must be honored for 5 years from the time the request is made.

47 C.F.R. § 64.1200(d)(1)-(4), (6); *see also id.* § 64.1200(e) ("The rules set forth in paragraph … (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing … text messages to wireless telephone numbers ….").

22. Thus, when companies, like Defendants, receive a request to stop sending text messages to a recipient of such messages, such companies have an obligation to place the person making the stop request on the company's internal do-not-call list, and to no longer send text messages to the person. *See* 47 C.F.R. § 64.1200(d)(3) and (d)(6).

23. Furthermore, the private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. *See* 47 U.S.C. § 227(c)(5). For example, while the Federal Communications Commission ("FCC") levied more than $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount.[12] Thus, the Congressional goal of deterrence relies heavily on TCPA enforcement by private consumers.

**B. Plaintiff And Class Members Received Numerous Text Messages Despite Unequivocally Opting Out**

24. At all times relevant hereto, Plaintiff owned a cell phone, the number for which was (646) XXX-7342.

25. At all times relevant hereto, Plaintiff used the aforementioned cell phone primarily for residential purposes.

26. Defendants, operating under the AQG brand name, engaged in a telemarketing campaign directed toward Plaintiff in furtherance of its efforts to sell him a car insurance policy.

27. Beginning in at least September 2025, Defendants sent or caused to be sent multiple telemarketing text messages to Plaintiff's cellular telephone number ending in 7342, from Defendants' telephone number, (833) 359-1177.

28. On or about September 12, 2025, Plaintiff responded to Defendants' (833) 359-1177 with the message "Stop" (as shown below), using clear and unambiguous opt out language in an attempt to opt out of any further text message communications with Defendants:

[12] The Wall Street Journal, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790.* (Mar. 28, 2019), *available at* https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.




29. Despite Plaintiff's unequivocal opt-out request, Defendants completely ignored Plaintiff's opt-out request and deliberately continued to bombard Plaintiff with more unwanted telemarketing text messages on at least September 13, 2025, and September 14, 2025, demonstrating a willful and knowing disregard for Plaintiff's clearly expressed wishes (as shown above).

30. Each time Defendants sent an unwanted message after September 12, Plaintiff dutifully responded "Stop," yet after each such opt-out request, Defendants continued to deliberately bombard Plaintiff with more unwanted telemarketing text messages.

31. This systematic and brazen pattern of TCPA violations demonstrates Defendants' complete failure to maintain any functional internal do-not-call procedures and its deliberate choice to ignore consumer opt-out requests.

32. Given the capabilities of modern telemarketing technology, Defendants have the ability to immediately comply with Plaintiff's opt-out requests.

33. By failing to immediately record and honor Plaintiff's do-not-call request and continuing to initiate telemarketing telephone solicitations after that request, Defendants failed to honor Plaintiff's do-not-call request "within a reasonable time." *See Lourie v. Papa John's Int'l, Inc.*, No. 1:23-CV-4320-MHC, 2024 U.S. Dist. LEXIS 119679, at *9-10 (N.D. Ga. June 25, 2024) ('Because the Court must accept as true [plaintiff's] allegation that 'Defendant has the capability of immediately complying with Plaintiff's [do-not-call] request,' at this stage of the dispute, the Court must infer that Defendant could have immediately complied with the request prior to the transmittal of the two telemarketing text messages in the week following Lourie's request.') (internal citations omitted).

34. Yet, despite Plaintiff's stop requests, Defendants continued to initiate unsolicited telemarketing solicitations to Plaintiff's phone.

35. The TCPA's implementing regulation, 47 C.F.R. § 64.1200(d), provides that "[n]o person or entity shall initiate … any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards: (1) Written policy. … (2) Training of personnel. … (3) Recording, disclosure of do-not-call requests. … (6) Maintenance of do-not-call lists."); *see also* 47 C.F.R. § 64.1200(e) ("The rules set forth in

paragraph … (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing … text messages to wireless telephone numbers ….").

36. Defendants failed to place Plaintiff on an internal do-not-call list after Plaintiff's explicit, and repeated, opt-out instructions.

37. As demonstrated by the above screenshot, Defendants do not honor reasonable consumer requests to opt-out of text message solicitations, in violation of 47 C.F.R. § 64.1200(d)(3) and (d)(6), among other provisions of the TCPA. *See* 47 C.F.R. § 64.1200(d)(3) ("Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made."); id. § 64.1200(d)(6) ("A do-not-call request must be honored for 5 years from the time the request is made."). Indeed, Plaintiff attempted to opt-out of Defendants' telephone solicitations <u>twice</u> by telling Defendant not to contact him anymore, but Defendants continued to text message Plaintiff, intentionally disregarding Plaintiff's instructions in order to solicit the sale of its services to Plaintiff.

38. Defendants' failure to honor Plaintiff's do-not-call requests strongly suggests that Defendant also does not meet the other "minimum standards" for the "procedures for maintaining a list of persons who request not to receive" that telemarketers must maintain, such as: (1) a written policy for maintaining an internal do-not-call list, as required by 47 C.F.R. § 64.1200(d)(1); (2) informing and training its personnel engaged in telemarking on the existence and use of any internal do-not-call list, as required by Section 64.1200(d)(2); (3) "record[ing] the request and plac[ing] the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made," as required by Section 64.1200(d)(3); and (4) maintaining a record of a consumer's request not to receive further texts, as required by Section 64.1200(d)(6).

39. Defendants' refusal to honor Plaintiff's opt-out requests demonstrates that Defendants do not have a written policy, available upon demand, for maintaining a do-not-call list, and that Defendants have not instituted procedures for maintaining a list of persons who request not to receive text messages from Defendants, in violation of 47 C.F.R. § 64.1200(d)(1).

40. Defendants' refusal to honor Plaintiff's opt-out requests demonstrates that Defendants do not provide training to its personnel engaged in telemarketing on the use and existence of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2). The precise details regarding their lack of training are solely within Defendants' knowledge and control.

41. Defendants' refusal to honor Plaintiff's opt-out requests demonstrates that Defendants do not maintain a standalone do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(3). The precise details regarding their failure to maintain a do-not-call list are solely within Defendants' knowledge and control.

42. This is also demonstrated by the AQG Website, which states in its Privacy Policy last updated on September 27, 2024, that, "**AutoQuoteGuide.com … does not maintain an internal do not call registry of its own**."[13]

43. Defendants did not maintain the required procedures for handling and processing opt-out requests prior to the initiation of the violative text messages it sent to Plaintiff as reflected by the fact that Plaintiff made multiple explicit opt-out requests and those requests were never processed; they were ignored by Defendants and their employees and Defendants continued to send text messages after Plaintiff made these opt-out requests.

---

[13] AutoQuoteGuide, *Privacy Policy* (last update Sep. 27, 2025), https://www.autoquoteguide.com/privacy-policy (last accessed Oct. 14, 2025) (emphasis added).

44. Indeed, it is implausible that Plaintiff would have continued receiving solicitations after a do-not-call request if Defendants had maintained the procedures required by 47 C.F.R. § 64.1200.

45. As demonstrated by the above screenshot, Defendants do not honor consumer requests to opt-out of text message solicitations. Indeed, Plaintiff attempted to opt-out of Defendants' text message solicitations by telling Defendants not to contact them anymore, but Defendants continued to text message Plaintiff.

46. Upon information and belief, Defendants do not have a written policy for maintaining an internal do not call list pursuant to 47 U.S.C. § 64.1200(d)(1).

47. Upon information and belief, Defendants do not inform and train its personnel engaged in telemarketing in the existence and the use of any internal do not call list pursuant to 47 U.S.C. § 64.1200(d)(2).

48. Furthermore, as explained below, Defendants' text messages to Plaintiff also violated the TCPA pursuant to 47 U.S.C. § 227(b)(1)(A)(iii), 47 C.F.R. § 64.1200(a)(1)(iii), and 47 C.F.R. § 64.1200(a)(2) because, as the AQG Website concedes, Defendants' "text messages [are] made with an autodialer,"[14] and because Plaintiff never consented to receiving Defendants' text messages, in writing or otherwise.

49. The TCPA prohibits Defendants from sending any text message using an ATDS without the recipient's prior express consent. *See* 47 U.S.C. § 227(b)(1)(A)(iii) ("It shall be unlawful for any person within the United States … (A) to make any call (other than a call … made with the prior express consent of the called party) using any automatic telephone dialing system … (iii) to any telephone number assigned to a … cellular telephone service …."); *accord*

[14] AQG Website, *SMS Terms* (last updated Sep. 27, 2024), https://www.autoquoteguide.com/sms-terms (last accessed Nov. 24, 2025).

47 C.F.R. § 64.1200(a)(1)(iii) ("No person or entity may: (1) Except as provided in paragraph (a)(2) of this section, initiate any telephone call (other than a call … made with the prior express consent of the called party) using an automatic telephone dialing system … (iii) To any telephone number assigned to a … cellular telephone service ….").

50. In addition, if a text message sent in violation of 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. § 64.1200(a)(1)(iii) "includes or introduces an advertisement or constitutes telemarketing," the text also violates the TCPA under 47 C.F.R. § 64.1200(a)(2), which provides that "[n]o person or entity may: … (2) Initiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system …, to any of the lines or telephone numbers described in paragraphs (a)(1)(i) through (iii) of this section, other than a call made with the prior express written consent of the called party …." (Emphasis added).

51. As demonstrated by the above screenshot, the purpose of Defendants' text messages was to advertise the commercial availability of its goods or services and/or encourage the purchase of or investment in such goods or services. Indeed, the information contained in the text messages shown above clearly advertise Defendants' online car insurance referral services through the AQG Website, which Defendants sends to promote their business.[15] Defendant's text messages therefore "include[] or introduce[] an advertisement," 47 C.F.R. § 64.1200(a)(2), as that term is defined by 47 C.F.R. § 64.1200(f)(1), and/or "constitute[] telemarketing," *id.* § 64.1200(a)(2), as defined by 47 C.F.R. § 64.1200(f)(13).

[15] *See also* AQG Website, *SMS Terms* (last updated Sep. 27, 2024), https://www.autoquoteguide.com/sms-terms (last accessed Nov. 24, 2025) ("Our text messages are intended to provide the consumer with information about … goods and services that may be offered by AutoQuoteGuide.com.").

52. At no point in time did Plaintiff provide Defendants with his prior express written consent to be sent marketing text messages or otherwise contacted for purposes of solicitation, whether before or after he first opted out in response to Defendants' text messages on September 12, 2025. That is, Plaintiff never provided his "agreement, in [a] writing[] bearing [Plaintiff's] signature … that clearly authorize[d Defendants] to deliver or cause to be delivered to [Plaintiff] advertisements or telemarketing messages using an automatic telephone dialing system," or otherwise met the requirements of 47 C.F.R. § 64.1200(f)(9).

53. And certainly, at no point in time after opting out of such text messages by replying "Stop" did Plaintiff provide Defendants with his express written consent to be contacted. Specifically, after opting out of Defenants' text messages, Plaintiff never completed any type of form that clearly and conspicuously authorized Defendants to contact Plaintiff's residential cellular telephone with marketing text messages. *See id*.

54. Thus, to the extent that Defendants *ever* had any consent to contact Plaintiff for marketing purposes, in writing or otherwise, that consent was expressly revoked on at least September 12, 2025, when Plaintiff first responded to Defendants' text message with "Stop." *See* 47 C.F.R. § 64.1200(a)(10) ("A called party may revoke prior express consent, including prior express written consent, to receive calls or text messages made pursuant to paragraphs (a)(1) through (3) … of this section by using any reasonable method to clearly express a desire not to receive further calls or text messages from the caller or sender. Any revocation request made using an automated, interactive voice or key press-activated opt-out mechanism on a call; using the words 'stop[]' … sent in reply to an incoming text message … constitutes a reasonable means per se to revoke consent. If a called party uses any such method to revoke consent, that consent is considered definitively revoked and the caller may not send additional robocalls and

robotexts. … All requests to revoke prior express consent or prior express written consent made in any reasonable manner must be honored within a reasonable time ….”).

55. Accordingly, in addition to Defendants’ violations of 47 C.F.R. § 64.1200(d) described above, Defendants also have violated 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. § 64.1200(a)(1)(iii) because they used an ATDS to send text messages to Plaintiff's cell phone without his prior express consent. Furthermore, Defendants have also violated 47 C.F.R. § 64.1200(a)(2) because these unsolicited texts sent by ATDS included an advertisement or constituted telemarketing, and because Plaintiff never authorized the text messages by providing Defendants with prior express *written* consent.

56. Defendants’ text messages were transmitted to Plaintiff's residential cellular telephone, and within the time frame relevant to this action.

57. Defendants sent the subject texts within this judicial district and, therefore, Defendants’ violations of the TCPA occurred within this district. Upon information and belief, Defendants caused other text messages to be sent to individuals residing within this judicial district.

58. Defendants’ texts were not made for an emergency purpose or to collect on a debt pursuant to 47 U.S.C. § 227(b)(1)(B).

59. Plaintiff has no existing business relationship with Defendants. *See* 47 C.F.R. § 64.1200(f)(5). Further, to the extent that Defendants ever had any business relationship with Defendants, any such relationship was expressly terminated on at least September 12, 2025, when Plaintiff first responded to Defendants’ text message with “Stop.” *See* 47 C.F.R. § 64.1200(f)(5)(i) (“The subscriber’s seller-specific do-not-call request, as set forth in paragraph (d)(3) of this section, terminates an established business relationship for purposes of

telemarketing and telephone solicitation even if the subscriber continues to do business with the seller.”).

60. Plaintiff is the subscriber and sole user of the 7342 Number and is financially responsible for phone service to the 7342 Number.

61. Plaintiff’s 7342 Number is his residential number which he uses for personal purposes.

62. The text messages originated from at least telephone number (833) 359-1177, a number which upon information and belief is owned and operated by Defendants or on behalf of Defendants.

63. Upon information and belief, Defendants have access to outbound transmission reports for all text messages sent advertising/promoting its services and goods. These reports show the dates, times, target telephone numbers, and content of each message sent to Plaintiff and the Class members. Defendants also have access to text message logs showing Plaintiff’s and the Class members’ inbound opt-out requests.

64. Defendants’ unwanted telemarketing text messages caused Plaintiff and Class members actual harm, including statutory damages, invasion of privacy, aggravation, annoyance, intrusion on seclusion, trespass, conversion, and violation of their statutory privacy rights. Defendants’ text messages also inconvenienced Plaintiff and Class members and caused disruption to their daily lives.

65. Defendants’ unwanted telemarketing text messages caused Plaintiff actual harm. Specifically, Plaintiff estimates that she has wasted fifteen to thirty seconds reviewing each of Defendants’ unwanted messages. Each time, Plaintiff had to stop what he was doing to either retrieve his phone and/or look down at the phone to review the message.

66. Next, Plaintiff wasted approximately fifteen minutes locating and retaining counsel for this case in order to stop Defendants' unwanted text messages. In all, Defendants' violations of the TCPA caused Plaintiff to waste at least fifteen minutes of her time in addressing and attempting to stop Defendants' solicitations. Additionally, the deliberate nature of Defendants' violations, continuing to send messages after his express opt-out requests, caused Plaintiff significant additional time loss and frustration.

67. Because Plaintiff and Class members received more than one text message in a 12-month period made by or on behalf of Defendants in violation of 47 C.F.R. § 64.1200(d), as described above, Defendants violated 47 U.S.C. § 227(c)(5).

68. As a result of Defendants' violations of 47 C.F.R. § 64.1200(d), Plaintiff and Class members are entitled to injunctive relief and an award of actual monetary loss or up to $500.00 in statutory damages per violation, whichever is greater, for each and every negligent violation, pursuant to 47 U.S.C. § 227(c)(5). *See id.* ("A person who has received more than one telephone call within any 12-month period by or on behalf of the same entity in violation of the regulations prescribed under this subsection may, if otherwise permitted by the laws or rules of court of a State bring in an appropriate court of that State—(A) an action based on a violation of the regulations prescribed under this subsection to enjoin such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive up to $500 in damages for each such violation, whichever is greater, or (C) both such actions.").

69. As a result of Defendants' violations of 47 C.F.R. § 64.1200(d), Plaintiff and Class members are entitled to a treble damages of up to $1,500.00 for each and every knowing and/or willful violation, pursuant to 47 U.S.C. § 227(c)(5). *See id.* ("… If the court finds that the defendant willfully or knowingly violated the regulations prescribed under this subsection, the

court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.”).

70. Independently, pursuant to 47 U.S.C. § 227(b)(3), Plaintiff and Class members are also entitled to injunctive relief and an award of actual monetary loss or up to $500.00 in statutory damages for each occasion that Defendants transmitted an unsolicited text message to Plaintiff and members of the putative Class using an ATDS in violation of 47 U.S.C. § 227(b)(1)(A)(iii), 47 C.F.R. § 64.1200(a)(1)(iii), and 47 C.F.R. § 64.1200(a)(2). *See* 47 U.S.C. § 227(b)(3) (“A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation, (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or (C) both such actions.”). Plaintiff and Class members are also entitled to a treble damages of up to $1,500.00 per violation for each and every knowing and/or willful violation 47 U.S.C. § 227(b)(1)(A)(iii), 47 C.F.R. § 64.1200(a)(1)(iii), and 47 C.F.R. § 64.1200(a)(2). *See* 47 U.S.C. § 227(b)(3) (“… If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under subparagraph (B) of this paragraph.”).

**CLASS ALLEGATIONS**

16. Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23, on behalf of Plaintiff and all others similarly situated.

17. Plaintiff brings this case on behalf of the Class defined as follows:

> All persons within the United States who, within the four years prior to the filing of this Complaint, received one or more text messages within any 12-month period, from or on behalf of Defendants, regarding Defendants’ goods or services, to said person’s residential cellular telephone number, *after* communicating to

Defendant that they did not wish to receive text messages by replying to the messages with a "stop" or similar opt-out instruction.

18. Plaintiff reserves the right to modify the Class definition as warranted as facts are learned in further investigation and discovery.

19. Excluded from the Class are (1) Defendants, their officers, and/or directors; (2) the Judge and/or Magistrate to whom this case is assigned; (3) the Judge or Magistrate's staff and family; and (4) Plaintiff's counsel and Defendants' counsel. Defendants and their employees or agents are excluded from the Class.

20. ***Numerosity.*** While the exact number of members of the Class is unknown to Plaintiff at this time, and can only be determined by appropriate discovery, upon information and belief, members of the Class is greater than 40. Members of the Class may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

21. ***Existence and Predominance of Common Questions of Law and Fact.*** There are numerous questions of law and fact common to members of the Class which predominate over any questions affecting only individual members of the Class. Among the questions of law and fact common to the members of the Class are:

(a) Whether Defendants sent text messages to Plaintiff and the Class Members;

(b) Whether Defendants continued to send text message solicitations after opt-out requests;

(c) Whether Defendants failed to honor Plaintiff's and the Class Members' opt-out requests;

(d) Whether Defendants maintain an internal do-not-call list and instructs their employees on how to use the list;

(e) Whether Defendants maintains the required policies and procedures under section 64.1200; and

(f) Whether Defendants are liable for damages, and the amount of such damages.

22. The common questions in this case are capable of having common answers, and Plaintiff and the Class members will have identical claims capable of being efficiently adjudicated and administered in this case.

23. ***Typicality.*** Plaintiff's claims are typical of the claims of the Class members, as they are all based on the same factual and legal theories as each member of the Class received Defendants' solicitation text message, replied with "STOP," and continued receiving text messages.

24. ***Adequacy.*** Plaintiff will fairly and adequately represent and protect the interests of the Class as required by Fed. R. Civ. P. 23(a)(4). Plaintiff is an adequate representative of the Class because he has no interests adverse to the interest of the Members of the Class. Plaintiff is committed to the vigorous prosecution of this action, and, to that end, has retained skilled and experienced counsel.

25. ***Superiority.*** A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are likely substantial, the individual damages incurred by each member of the Class resulting from Defendants' wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases.

26. The prosecution of separate actions by members of the Class would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas

another may not. Additionally, individual actions may be dispositive of the interests of the Class, although certain class members are not parties to such actions.

**COUNT I**
**Violation of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(d)**
**(On Behalf of Plaintiff and the Nationwide Class)**

27. Plaintiff re-alleges and incorporates by reference every allegation set forth in the preceding paragraphs as if fully set forth herein.

28. Plaintiff brings this claim individually and on behalf of the Class against Defendants.

29. 47 C.F.R. § 64.1200(d) provides, in pertinent part, as follows:

> (d) No person or entity shall initiate … any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive such calls made by or on behalf of that person or entity. The procedures instituted must meet the following minimum standards:
>
> > (1) ***Written policy.*** Persons or entities making … calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list.
> >
> > (2) ***Training of personnel.*** Personnel … who are engaged in any aspect of telemarketing must be informed and trained in the existence and use of the do-not-call list.
> >
> > (3) ***Recording, disclosure of do-not-call requests.*** If a person or entity making … any call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made. Persons or entities making such calls (or on whose behalf such calls are made) must honor a residential subscriber's do-not-call request within a reasonable time from the date such request is made. …
> >
> > (4) ***Identification of callers and telemarketers.*** A person or entity making … any call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted. The telephone number provided may not be a 900 number or any other number for which charges exceed local or long distance transmission charges. …

> (6) ***Maintenance of do-not-call lists.*** A person or entity making … any call for telemarketing purposes must maintain a record of a consumer's request not to receive further calls. A do-not-call request must be honored for 5 years from the time the request is made.

47 C.F.R. § 64.1200(d)(1)-(4), (6); *see also id*. § 64.1200(e) ("The rules set forth in paragraph … (d) of this section are applicable to any person or entity making telephone solicitations or telemarketing … text messages to wireless telephone numbers ….").

30. Defendants are subject to the requirement of 47 C.F.R. § 64.1200(d) because they are an "entity making telephone solicitations or telemarking calls or text messages to wireless telephone numbers[.]" 47 C.F.R. § 64.1200(e).

31. Plaintiff and the Class Members are residential telephone subscribers who received more than one text message made for purposes of telemarketing or solicitation from Defendants, who have failed to implement the requisite procedures and personnel training as demonstrated by their repeated failure to honor opt-out requests.

32. Plaintiff and the Class members made requests to Defendants not to receive texts from Defendants.

33. Plaintiff and the Class Members revoked any consent they may have provided Defendants by responding with "stop" or similar opt-out instructions in response to Defendants' text messages.

34. Plaintiff and Class Members terminated any business relationship they may have previously had with Defendants by replying with a "stop" or similar opt-out instruction in response to Defendants' text messages. *See* 47 C.F.R. § 64.1200(f)(5)(i). (A consumer's "seller-specific do-not-call request … terminates an established business relationship for purposes of telemarketing and telephone solicitation even if the subscriber continues to do business with the seller.").

35. Defendants continued to send text messages to Plaintiff and the Class Members to harass them into using Defendants' platform.

36. Defendants failed to honor Plaintiff's and the Class Members' opt-out requests.

37. Defendants' refusal to honor opt-out requests is indicative of Defendants' failure to implement a written policy for maintaining a do-not-call list and to train its personnel engaged in telemarketing on the existence and use of the do-not-call-list.

38. Defendants have not instituted procedures for maintaining a list of persons who requested not to receive telemarketing calls or text messages or otherwise comply with the requirements for maintaining and following such a list.

39. Defendants do not have a written policy, available upon demand, for maintaining a do-not-call list and properly abiding by it.

40. The details and specific facts regarding Defendants' failure to maintain the required policies and procedures, as well as personnel training, are solely within Defendants' knowledge and possession.

41. Defendants have violated 47 C.F.R. § 64.1200(d) by failing to honor opt-out requests, failing to maintain the required policies and procedures, and failing to train its personnel engaged in telemarketing.

42. Pursuant to section 227(c)(5) of the TCPA, Plaintiff and the Class members are entitled to an award of $500.00 in statutory damages for each and every negligent violation.

43. Furthermore, Defendants' practice of continuing to completely ignore Plaintiff's and Class members' opt-out unequivocal and repeated requests and deliberately continuing to bombard Plaintiff and Class members with more unwanted telemarketing text messages after multiple such requests demonstrated Defendants' willful and knowing disregard for, and continued failure to honor, Plaintiff's and Class members' requests. As a result, Plaintiff and

Class members are entitled to a treble damages of up to $1,500.00 per violation, for each and every knowing and/or willful violation, pursuant to 47 U.S.C. § 227(c)(5).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for the following relief:

a) An order certifying this case as a class action pursuant to the Federal Rules of Civil Procedure on behalf of the Class as defined above, appointing Plaintiff as the representative of the Class, and appointing Plaintiff's counsel as Class Counsel;

b) An award of statutory and/or treble damages for Plaintiff and each member of the Class as applicable under the TCPA;

c) An order declaring that Defendants' actions, as set out above, violate the TCPA;

d) An injunction requiring Defendants to comply with the TCPA, including all applicable implementing regulations;

e) For an award of punitive damages for Defendants' willful and repeated violations; and

f) Such further and other relief as the Court deems necessary.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury on all claims so triable.

Dated: November 26, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*
Philip L. Fraietta

Philip L. Fraietta
50 Main Street, Suite 475
White Plains, NY 10606
Telephone: (914) 874-0708
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com

Julia K. Venditti*
Joshua B. Glatt*
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: jvenditti@bursor.com
jglatt@bursor.com

**pro hac vice forthcoming*
*Attorneys for Plaintiff*